IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

STEPHANIE J. COOK,

     Plaintiff,

v.           CIVIL  ACTION  NO.  3:09-1002

HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are the parties cross-motions for summary judgment.  For reasons explained below the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 20) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 22).

**Background**

This case centers on death of Larry W. Cook due to the inappropriate administration of Norcuron by his treating physician.  Through her employer, his widow, Stephanie Cook, was insured for his accidental death with a policy from Defendant Hartford Life and Accident Insurance Company ("Hartford").  Because of the language contained within Plan documents, Ms. Cook was not able to  receive proceeds from the insurance if her husband died as the result of medical or surgical treatment of a sickness or disease.  The policy exclusions, however, may not apply if her husband died as the result of a violent and intentional act intended to cause his death.  Plaintiff argues that Defendant ignored evidence which establishes that the administration of Norcuron was such an act.  Defendant does not deny that Norcuron was the cause of death but contends the

evidence shows the drug was administered as part of medical treatment and thus Mr. Cook's death falls within the policy exclusion.

The Court is aware of the emotional impacts these facts may have on entities within and outside of these proceedings.  It is cognizant that issues related to the manner of Mr. Cook's death are central to this case, and must be handled with care.  The Court emphasizes, however, that its role is to resolve an insurance dispute between the parties – based on the law and facts relevant to that dispute – not to conclusively determine or pass judgment upon the manner of decedent's death.  Mindful of this role, for reasons explained below, the Court concludes that Mr. Cook's death falls within the policy exclusion and consequently benefits are not recoverable.

I.    **Ms. Cook's Accidental Death and Dismemberment Policy Through Hartford.**

Ms. Cook obtained accidental death and dismemberment coverage through defendant Hartford.  Hartford issued "the Policy," number 22-ADD-007284, to her employer, BB&T Corporation, the designated Policyholder.  This Policy is part of a Life, Supplemental Life, Dependant Life and Accidental Death and Dismemberment Plan (the Plan), established and maintained by BB&T as plan sponsor.  As the Plan documents provide, "this Policy is incorporated into, and forms a part of the plan."  Admin. Rec. at HL0052 (Doc. 19).  The Plan confers "full discretionary authority" on Hartford, as claims fiduciary, "to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  *Id.* at 55.

The Policy provides that a claimant is entitled to benefits "[i]f the Covered Person's injury results" in a loss.  *Id.* at 31.  "Injury" is defined as,

> bodily     injury     resulting     from     accident     and
> independently of all other causes which occurs while

-2-

the Covered Person is covered under the Policy.  Loss
resulting from:

    a)    sickness or disease, except a
            pus-forming infection which
            occurs through an accidental
            wound; or
    b)    medical or surgical treatment
            of a sickness or disease;

is not considered as resulting from Injury.

*Id.* at 70.  The Policy does not define the term "accident."

As an "Eligible Dependant" Larry Cook (Ms. Cook's husband) was a "Covered Person" under the Policy.  Under the terms of the Policy she was entitled to receive 60% of the "Principal Sum," which she had established at $500,000, – meaning she was entitled to receive $300,000 for the loss of her husband through covered circumstances.

## II.  Claim for Benefits

Mr. Cook died in the early morning hours of January 4, 2007, while hospitalized at CAMC Teays Valley Hospital.  He had been admitted on January 2, 2007, for emergency treatment from gastrointestinal bleeding and hepatic encephalopathy.  His cause of death on the certificate completed by the attending physician, Dr. Sean DiCristofaro, was identified as "coagulopathy due to (or as a consequence of) liver failure, cirrhosis, alcohol abuse."  *Id.* at 238.  Renal failure and bacteremia were noted as other significant conditions contributing to Mr. Cook's death.  In a box under the title "Manner of Death" Dr. DiCristofaro checked "Natural."  *Id.*

Following an investigation by the West Virginia Office of Chief Medical Examiner, Mr. Cook's death certificate was amended on October 11, 2007.  The Chief Medical Examiner, Dr. Kaplan, identified Mr. Cook's cause of death as "respiratory arrest due to (or as a consequence of)

vecuronium administration," and explained that death had occurred as the result of "intentional inappropriate use of vecuronium blockade by physician." *Id.* at 239.  (Norcuron is the trade name for vecuronium).   He indicated that the respiratory arrest had occurred within minutes of the Norcuron administration and that death had come quickly thereafter.  Dr. Kaplan labeled the manner of death as a homicide.

The West Virginia Board of Medicine (BOM) also conducted an investigation into circumstances surrounding the death of Mr. Cook.  The BOM's findings constitute the most detailed report of the events immediately prior to Mr. Cook's death.  The following facts are described within the BOM's Consent Order.

1.  Mr. Cook had been receiving medical treatment from Dr. DiCristofaro related to end-stage liver failure for several years prior to his death.  He was hospitalized on multiple occasions while waiting for a liver transplant.   During these hospitalizations he periodically received transfusions and dialysis.  *Id.* at 263 .

2.  On January 2, 2007, Mr. Cook went to the Emergency Room at CAMC Teays Valley Hospital and was then transferred to the Intensive Care Unit (ICU).   He suffered from gastrointestinal bleeding and hepatic encephalopathy.  Medical personnel conducted an endoscopic search for the source of the bleeding and treated Mr. Cook with blood products, renal dialysis, antibiotics, and a variety of drugs.  He was, however, critically ill and went into cardio-pulmonary failure.  *Id.*

3.  While in the ICU Mr. Cook received regular pain medication.  His medical records variously describe his condition as "incoherent" or "agitated" while at other times describing him as comfortable.  *Id.*

-4-

4.  On January 4, 2007, Mr. Cook's condition declined further.  Dr. DiCristofaro, after consultation and agreement from Ms. Cook, changed Mr. Cook's status to "Do Not Resuscitate" and "Do Not Intubate."  The family decided at that point to shift Mr. Cook's treatment to comfort and care measures.  *Id.* at 264.

5.  Between 3:00 a.m. and 5:00 a.m. on January 4, 2007, hospital staff administered additional narcotic pain medication to Mr. Cook.   Mr. Cook experienced low blood pressure and respirations described by the attending nurse as "labored" and Dr. DiCristofaro as "agonal with significant periods of apnea."  (Agonal breathing is shallow slow breathing which might also be characterized as gasping.)  Dr. DiCristofaro stated that at that time his patient's agonal gasping was more severe than any patient he had seen before.  Dr. DiCristofaro also reported that Mr. Cook was "obtunded and unresponsive" and that his family was "distraught" over the agonal breathing.  *Id.*

6.  At some point between 5:00 and 5:30 a.m. Dr. DiCristofaro had a conversation with Ms. Cook and concluded that additional or different doses of pain medication would not relieve Mr. Cook's agonal breathing.  Dr. Cristofaro offered to administer another medication which might help ease the gasping.   Reportedly, Ms. Cook told him to do everything he could "to keep him comfortable."  Dr. DiCristofaro then asked a nurse for 10mg of Norcuron, which he administered intravenously.  Mr. Cook became totally apneic and his heart stopped.  He was pronounced dead at 5:38.  *Id.* at 264-65.

Aside from this recitation of facts, the BOM reached several conclusions about Mr. Cook's care.  They described palliative care as that "intended to provide comfort and alleviate a patient's suffering" and stated that it "should be consistent with the level of a patient's suffering."  *Id.* at 265. The BOM concluded that from 1:30 a.m. to 5:00 a.m on January 4, 2007, Dr. DiCristofaro met the

-5-

prevailing medical and ethical standards for the use of palliative care.  The BOM further found, however, that "when Dr. DiCristofaro made the decision to administer 10 mg Norcuron to [Mr. Cook] he deviated from the prevailing standards of medical and ethical care."  *Id.*

Describing Norcuron, the BOM stated that it should only be given to "cause paralysis, and has no intrinsic analgesic or sedating effects."  *Id.*  They found that there is "no general acceptance within the field of medicine for the use of such agents for palliation of pain and suffering, and the use of such agents during 'end of life care' does not meet the prevailing standards of medical and ethical care."  *Id.*  The BOM noted that there is minority support in the medical literature that Norcuron might, in rare circumstances, be appropriate for end of life care.  It stated its disagreement with that view.

The BOM accepted Dr. DiCristofaro's statement that he had been presented with a clinically difficult and emotionally painful situation with Mr. Cook, and that weighed heavily on him.  Dr. DiCristofaro believed that the patient was approaching death and that his agonal respirations were uncomfortable.  The BOM wrote,

> Dr. DisCristofaro has explained that, in administering Norcuron, it was not Dr. DiCristofaro's intent to hasten death, or cause [Mr. Cook's] death, but rather to ease the agonal respirations that his patient was experiencing which he believed capable of causing pain.  He acted compassionately toward his patient and the family by attending the patient, discussing the care with family and providing palliative care. However, Dr. DiCristofaro deviated from prevailing standards of palliative care when he administered Norcuron to his patient as death approached.

*Id.* at 266.

-6-

In the end, the Board found that there was probable cause to substantiate charges of violations of provisions of the West Virginia Code and West Virginia Administrative Code "all relating to administering a prescription drug other than in good faith and in a therapeutic manner in accordance with accepted medical standards, unethical or unprofessional conduct, failure to perform a legal or statutory obligation placed upon the physician, and failure to practice medicine acceptably or otherwise violating the law." *Id.* at 267. Because of its findings that Dr. DiCristofaro could "adversely affect the health, safety, and welfare of patients" the BOM suspended him for six months, placed him on probation up to five years and significantly restricted his use of Norcuron and similar drugs. *Id.* at 267-68.

On January 28, 2008, Plaintiff filed a claim for accidental death benefits. Hartford considered the original death certificate (listing the manner of death as "Natural"), the claimant's claim form, and the Consent Order from the BOM. Hartford then denied the claim, explaining

> [i]t has been established that Mr. Cook's death was caused by coagulopathy, liver failure, cirrhosis, and alcohol abuse, as well as renal failure. Because Mr. Cook's death was not independent of all other causes, and was due to sickness or disease, as well as medical treatment of a sickness of disease, it is not considered the result of an injury, and his death does not constitute a covered loss under the terms of the Policy.

*Id.* at 194.

Following the initial denial of her claim, Plaintiff faxed Hartford a copy of the amended death certificate, in which Dr. Kaplan had checked "homicide" in the box next to manner of death and indicated that death was the result of the administration of Norcuron. On October 8, 2008, Hartford issued a second denial after considering both death certificates, the claimant's form, the

BOM's Consent Order and a report from its own nurse consultant, Kathleen M. Bell – which relied

predominately on the order from the BOM. After summarizing the contents of those documents the

letter advised,

> It is clear from the documents reviewed that Mr. Cook
> was critically ill and approaching death.  He status
> was "Do Not Resuscitate" and "Do Not Intubate."
> His death occurred while he was confined to a
> hospital receiving medical treatment for his critical
> illnesses, Coagulopathy, with Liver Failure, Cirrhosis,
> Alcohol Abuse, as well as Renal Failure and
> Bacteremia.  Because Mr. Cook's death did not result
> from bodily injury resulting directly from accident
> and independently of all other causes, and was due to
> medical or surgical treatment of a sickness or disease,
> which is not considered as resulting from injury, his
> death does not constitute a covered loss under the
> terms of the Policy.

*Id.* at 191.

After the second denial Ms. Cook submitted her own affidavit regarding the relevant events

as well as additional medical records.  Her letter to Hartford explained her position that her husband

had not died of natural causes, but rather by the "intentional, violent act of a health care provider."

*Id.* at 141.  In her affidavit she stated that she had not been included in the BOM investigation.  The

affidavit contains statements explaining that her husband had been deemed a good candidate for a

liver transplant and that they were hopeful about his prognosis.  Regarding the January 2007

hospitalization, Ms. Cook stated that she believed it was "no different from prior hospitalizations

other than for rectal bleeding; it was anticipated he would fully recover from his immediate problem

. .." *Id.* at 144.  She testified that her husband had been stable on January 3rd, and that in fact she had

planned to go to work on the 4th.  *Id.*  She states that she agreed to the do not resuscitate order, but

only intended that her husband not be intubated.  *Id.*  Ms. Cook does not provide any details about hours or minutes immediately preceding her husband's death.

The final letter and attached information was considered by Hartford's Appeal Specialist. In a letter dated January 14, 2009, the Appeals Specialist denied the claim.  It provided,

> The policy states that a loss which results from medical or surgical treatment of a sickness or disease is not considered to be an injury.  Dr. DiCristofaro administered Norcuron to ease agonal respirations, in lie of additional or different doses of sedation and/or pain medications which he did not believe would relieve Mr. Cook's symptoms.  Although the use of Norcuron was a deviation from the prevailing standards of medical and ethical "end of life" care, Dr. DiCristofaro's administering of this drug was to relieve Mr. Cook's agonal breathing symptoms, which were present secondary to cardio-pulmonary failure.  Therefore, Dr. DiCristofaro's injection of Norcuron, which subsequently resulted in Mr. Cook's death per the amended Medical Examiner's Certificate of Death, was medical treatment of a sickness or disease.
>
> In closing, based on the totality of the evidence provided, Appeals finds that the decision to deny [Accidental Death and Dismemberment] benefits to be proper and is upheld.  We find that this loss is not an injury under the provisions of the policy as it was the result of medical or surgical treatment of a sickness or disease.  The cause of death as "homicide" on the amended Medical Examiner's Certificate of Death, in [and] of itself, does not support payment of benefits. . .

*Id.* at 122.

It is from this decision that Plaintiff filed the instant lawsuit.  She contends that the record shows Dr. DiCristofaro intentionally killed her husband, and that this type of injury is compensable under the Policy.  Defendant does not disagree that the cause of death was Norcuron nor that its

administration was outside of the prevailing standard of medical care.  Defendant simply disagrees

that it was the intention of Dr. DiCristofaro to kill his patient.


## Standard of Review

I.     **Under ERISA the Court Reviews the Administrator's Decision for Abuse of Discretion**

"A federal court's ability to review a discretionary decision of the administer of an employee

benefits plan is significantly limited."  *Elliot v. Sara Lee Corp.*, 190 F3d 601, 605 (4th Cir. 1999).

If the plan vests discretionary authority in the plan administrator or a fiduciary "'to determine

eligibility for benefits or to construe the terms of the plan' a reviewing court may reverse the denial

of benefits only upon a finding of abuse of discretion."  *Id.* (quoting *Firestone Tire & Rubber Co.*

*v. Bruch*, 489 U.S. 101 (1989).   In applying the abuse of discretion standard, the reviewing court

may not substitute its own judgment for that of the administrator.  The administrator's decision

cannot be disturbed if it is "the result of a deliberate, principled reasoning process and if it is

supported by substantial evidence."  *Id.* (*quoting Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.

1997).


II.    **As There Are No Material Facts In Dispute It Is Appropriate to Grant Summary**
       **Judgment Based on the Administrative Record**

To obtain summary judgment, the moving party must show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence

and determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Instead, the Court will draw any permissible inference from the underlying facts in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)

At one point in her briefing, Plaintiff mistakenly argues that the inconclusiveness over Mr. Cook's death is a material fact that should prevent the Court from granting summary judgment. As the Court has already pointed out, the point in these proceedings is not to conclusively determine the cause of Mr. Cook's death or the intent of the attending physician who administered Norcuron. Rather, it is the role of this Court, and the point of these proceedings, to determine whether the claims administrator abused its discretion when reviewing the administrative record. As there is no dispute about the contents of the records, its completeness, or any allegation that there is evidence outside the record which was considered by the claims administrator, there is no material fact in dispute and summary judgment at this stage of the proceedings is appropriate.

## Analysis

While there is certainly conflicting evidence in the record regarding the manner of Mr. Cook's death, it is apparent that Hartford's decision was the result of a principled reasoning process and supported by evidence. At each stage of the process Hartford considered the evidence before

-11-

it, in the context of the entire record, and set forth a rational explanation of its decision in its denial letter to Ms. Cook.  Although the record before its was not conclusive, Hartford justified its decisions and as such its conclusions are entitled to deference from this Court and should not be disturbed.

In its first consideration of the claim for benefits the record before Hartford contained only the BOM Consent Order, the certificate of death completed by Dr. DiCristofaro, and Ms. Cook's claim application.  Hartford justified its decision principally on the fact that Dr. DiCristofaro had determined the cause of death to be "caused by coagulopathy, liver failure, cirrhosis, and alcohol abuse, as well as renal failure."  Admin. Rec. at 194.  While the BOM Consent Order recognized that Norcuron had hastened Mr. Cook's death, and that Dr. DiCristofaro had inappropriately administered the drug, it was reasonable to interpret the report as concluding that the drug was given by Dr. DiCristofaro as part of Mr. Cook's treatment for his illness.  The decision that the death resulted from a sickness or disease, or medical treatment for a sickness of disease, was thus supported by evidence and not an abuse of discretion.

The submission of the amended death certificate completed by Dr. Kaplan brought Dr. DiCristofaro's actions into sharper focus.  At that point there was clearly conflicting evidence over the manner of death, and a factual issue which would implicate the policy exclusion. Opinions from both the Fourth Circuit Court of Appeals and the West Virginia Supreme Court indicate that measures intentionally calculated to bring about a patient's death would not be considered "medical treatment" under the law.  Considering a claim for accidental death benefits with a policy exclusion

to the one at issue here,[1] the Fourth Circuit stated, "Death is never caused by medical treatment absent some misdiagnosis or mistake." *Whetsell v. Mutual Life Ins. Co.*, 669 F.2d 955, 957 (4th Cir. 1982).  Reviewing a claim for accidental death benefits from a claimant whose daughter was hypersensitive to novocaine and died after receiving an injection, the West Virginia Supreme Court commented,

> It is argued that the death of the insured may be said to be an accident from the fact that the surgeon did not intend to inject the novocaine into a body which was hypersensitive to the drug, and that the patient would not have submitted to the injection had she known such to be true; but may it not also be said that a surgeon never intends to administer an anesthetic calculated to bring about the death of a patient. . . .

*Otey v. John Hancock Mut. Life Ins. Co.,* 199 S.E. 596, 599 (W.Va. 1938).  If the administration of a drug intended to end the life of a patient cannot be considered medical treatment of a sickness or disease, then it must fall outside the exclusion contained within the Policy.  On the other hand, if the administration of Norcuron by Dr. DiCristofaro was not an intentional act of violence, but rather an act meant simply to alleviate pain and suffering during the end of his patient's life, then that action falls under the meaning of medical treatment – even if that treatment deviated from the standards of medical and ethical care.  *Whetsell,* 669 F.2d at 957 ("Since all deaths caused by medical treatment absent some misdiagnosis or mistake necessarily involve treatment, to say that mistreatment is not covered by the exclusion is to say that the provision excludes nothing.").

---

[1]The policy exclusion in *Whetsell* provided, "Under this rider the Company does not assume the risk of death caused or contributed directly or indirectly, by a disease, by bodily or mental infirmity, or by treatment or operation for disease or bodily or mental infirmity. . ." 669 F.2d at 956.

-13-

While the Medical Examiner disagreed with Dr. DiCristofaro about the cause and manner of Mr. Cook's death, neither his opinion nor the amended death certificate are dispositive. *See Clark v. Metropolitan Life Ins. Co*, 369 F.Supp.2d 770, 776 (E.D. Va. 2005) ("neither the dictionary definition nor the cause of death as certified by the Medical Examiner determine whether the death was an 'accident' for purposes of the Plan."); *Mullaney v. Aetna U.S. Healthcare*, 103 F.Supp.2d 486 (D. R.I. 2000) ("the medical examiner's determination of "accident" does not mean that Mr. Mullaney's 'accident' was of the sort contemplated by defendant or described in the Plan."); *Sangster v. Metropolitan Life Ins. Co.*, 54 F.Supp.2d 708, 712 (E.D. Mich. 1999) ("it is reasonable for the MetLife administrator to determine that the coroner's conclusion did not bind his/her examination of the evidence."). The decision of the Medical Examiner conflicted with that of the BOM. The BOM Consent Order can reasonably be read to accept Dr. DiCristofaro's testimony that he did not intend to hasten Mr. Cook's death when he administered Norcuron. While a rapid death was the end result of the drug, and the board concluded that Dr. DiCristofaro's administration of Norcuron was not within the medical or ethical standards for palliative care, it did  not find that Dr. DiCristofaro intentionally ended his patient's life.  Rather it found that Dr. DiCristofaro "acted compassionately toward his patient and the family by attending the patient, discussing the care with family and providing palliative care" even though he ultimately deviated from the generally accepted standards of palliative care.  Admin. Rec. at 266..  The BOM's report and its ultimate decision, to suspend Dr. DiCritofaro for six months and place him on probation, is inconsistent with the Medical Examiner's determination of homicide.  Faced with conflicting evidence in the record the Court cannot find that Hartford abused its discretion when it relied on the more detailed and comprehensive findings of the BOM to conclude that "Mr. Cook's death did not result from bodily

-14-

injury resulting directly from accident and independently of all other causes, and was due to medical or surgical treatment of a sickness or disease, which is not considered as resulting from injury." *Id.* at 267-68.

With her final appeal to Hartford, Ms. Cook submitted Mr. Cook's medical records from his final hospital visit as well as her own affidavit. While this affidavit does indicate that she was optimistic about her husband's prospects for recovery, even during much of his hospitalization , it does not provide any information about the critical final hours of Mr. Cook's death. As such it does little to rebut the facts and findings within the BOM's Consent Order or to bolster the opinion of the Medical Examiner regarding the manner of Mr. Cook's death. Likewise, the additional medical records submitted in the file do nothing to shed light on the intentions of Dr. DiCristofaro, when he administered Norcuron to Mr. Cook. For that reason, Hartford's Appeal Specialist was justified in continuing to rely on the BOM findings, and to conclude that, "[a]lthough the use of Norcuron was a deviation from the prevailing standards of medical and ethical 'end of life' care, Dr. DiCristofaro's administering of this drug was to relieve Mr. Cook's agonal breathing symptoms, which were present secondary to cardio-pulmonary failure." *Id.* at 122. For this reason the final denial of benefits was not an abuse of discretion.

Plaintiff argues that the throughout the claims process Hartford placed too much weight upon the statements and opinions of Dr. DiCristofaro, despite his obvious motivations to shift blame away from himself and that the defendant ignored the findings of its own nurse consultant. The record does not bear this out. In the first denial of benefits, Hartford certainly relied heavily on the death certificate filled out by Dr. DiCristofaro. Subsequently, however, more and more reliance was placed upon the Consent Order from the BOM. While the BOM ultimately accepted Dr.

DiCritsofaro's version of events, it did not limit its investigation to his testimony.  As stated by the BOM itself, their investigation "included numerous interviews of health care professionals, the patient's family members, consultation with an expert in medical ethics, review of medical literature, and a review of the analysis of hospital records."  Admin. Rec. at 262. The report from Hartford's nurse consultant, Ms. Bell, was predominately taken from the BOM Order and did not contradict it.   Hartford was not unjustified in relying on the BOM Consent Order to provide much of the evidence in support of its decision.

The Court would close by reiterating that it is not determining or casting judgment on the manner of Mr. Cook's death. The decision that Hartford did not abuse its discretion in concluding that Mr. Cook's death fit within the exclusion clause of the Policy is not a finding of fact on issues related Mr. Cook's end of life care.  It is simply a finding that the record supports the decision of the claims administrator and, as such, the role of the Court to leave that decision intact.

## CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 20) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 22).  The Court **DIRECTS** the Clerk to send a copy of this Order  to counsel of record and any unrepresented parties.

ENTER:   August 18, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE